**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| MICHELLE BEREDA, ANGELENE HOEFFKEN, and SCOTT NERI, individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br>   v.<br><br>NISSAN NORTH AMERICA, INC., and NISSAN MOTOR CO., LTD.,<br><br>              Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Michelle Bereda, Angelene Hoeffken, and Scott Neri ("Plaintiffs") bring this class action against Nissan North America, Inc. ("NNA") and Nissan Motor Co., Ltd. ("NMC") (together, "Nissan" or "Defendants"), individually and on behalf of the below-defined statewide classes they respectively seek to represent (collectively, the "Class") consisting of all persons who currently or formerly owned or leased any Nissan brand light vehicle equipped with a Continental ARS410 radar sensor, including the following: 2019-2021 Maxima, 2020-2021 Sentra, 2020-21 Versa, 2017-2021 Rogue Sport, 2019-2021 Altima, 2020-2021 Kicks, 2017-2020 Rogue, 2021 Armada, 2018-2021 Leaf, 2019-2021 Murano, 2020-2021 Titan (hereinafter, the "Class Vehicles"). The allegations herein are based on personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to all other matters based on an investigation by counsel.

## NATURE OF THE ACTION

1.      In its quest to be commercially competitive, Nissan designed, tested, validated, marketed, and sold its Forward Emergency Braking system ("FEB") that is featured in every Class Vehicle. According to Nissan itself:

> [T]his intelligent feature uses radar technology to monitor a vehicle's proximity to the vehicle ahead, giving the driver audible and visual display warnings to help the driver reduce the vehicle's speed if a potential frontal collision is detected. If the driver fails to respond, the [Forward Emergency Braking] system can apply the brakes, helping the driver to avoid the collision or reduce the speed of impact if it is unavoidable.[1]

2.      However, Defendants wrongfully and intentionally concealed, and continue to conceal, from the pre-purchase/lease transaction to the present day, one or more defects in the

---

[1] The Confidence of Nissan Safety Technology, Nissan Safety Features & Technologies (Dec. 16, 2019), https://www.nissanusa.com/experience-nissan/news-and-events/car-safety-features-technology.html (last visited May 7, 2020).

Class Vehicles' FEB system that can cause it to falsely engage or otherwise not work as intended ("FEB Defect"). The FEB Defect causes, among other things, (1) the Class Vehicles to detect non-existent obstacles, thereby automatically triggering the brakes and causing the Class Vehicles to abruptly slow down or come to a complete stop with no actual need to do so, and/or (2) the FEB system to deactivate itself, thereby distracting the driver and rendering the FEB system disabled and useless. In either scenario, however, the FEB system is not a safety feature, as Nissan claimed, but rather an unpredictable and unreasonable safety hazard.

3. The FEB Defect can cause the Class Vehicles to stop without warning during normal and intended vehicle operation, thereby posing an unreasonable safety hazard to drivers, passengers, other motorists, and pedestrians. Plaintiffs and other Class members have reported significant, unexpected phantom decelerations and stops due to the false engagement of the Class Vehicle's FEB system, even though no objects – vehicles, pedestrians, or otherwise – were nearby. Additionally, Plaintiffs and other Class members have complained that the FEB system also frequently deactivates itself, detracting their focus from the road and rendering the FEB safety feature useless.

4. Nissan marketed, and continues to market, the Class Vehicles, and the FEB system specifically, as safe and reliable. Defendants, however, failed to disclose the FEB Defect to consumers, despite their knowledge that the Class Vehicles were defective and not fit for their intended purpose of providing consumers with safe and reliable transportation at the time of the sale and thereafter. Defendants have actively concealed and continue to conceal the true nature and extent of the FEB Defect from Plaintiffs and the other Class members after failing to disclose it to them at the time of purchase, lease or repair. Had Plaintiffs and the other Class members known about the FEB Defect, they would not have purchased and/or leased the Class Vehicles or

would have paid less for them. As a result of their reliance on Defendants' concealment/omissions, and its active concealment, Plaintiffs and the other Class members have suffered an ascertainable loss of money, property, and/or loss in value of their Class Vehicles.

5. Despite notice of the FEB Defect from, among other things, pre-production testing, consumer complaints, warranty data, and dealership repair orders, Defendants have not recalled the Class Vehicles to repair the FEB Defect, have not offered Plaintiffs and the other Class members a suitable repair or replacement free of charge, and have not offered to reimburse Plaintiffs and the other Class members the costs they incurred relating to diagnosing and repairing the FEB Defect or for the value consumers paid for the FEB feature in the first place. Defendants have refused to repair or replace the Class Vehicles despite the fact that the Class Vehicles are under a comprehensive warranty, as explained in detail below. Thus, Defendants have wrongfully and intentionally transferred the cost of repair of the FEB Defect to Plaintiffs and the other members of the Classes by fraudulently concealing the existence of the FEB Defect.

6. Under the warranties provided to Plaintiffs and the other members of the Classes, Defendants promised to repair or replace defective FEB components arising out of defects in materials and/or workmanship, such as the FEB Defect, at no cost to owners or lessors of the Class Vehicles. For illustrative purposes, NNA offers a 36-month or 36,000-mile Basic Warranty that "covers any repairs needed to correct defects in materials or workmanship of all parts and components of each new Nissan vehicle supplied by Nissan."[2]

7. Defendants breached their express and implied warranties through which they promised to, *inter alia*, (1) provide Class Vehicles fit for the ordinary purpose for which they were

---

[2] Nissan, 2016 Warranty Information Booklet,
https://owners.nissanusa.com/content/techpub/common/2016/2016-nissan-warranty-booklet.pdf
(last visited Feb. 7, 2022).

sold; and (2) repair and correct manufacturing defects or defects in materials or workmanship of any parts they supplied, including in the FEB System. Because the FEB Defect was present at the time of sale or lease of the Class Vehicles, Defendants are required to repair or replace the Class Vehicles pursuant to the terms of the warranty. Instead, Nissan has wrongfully shifted the cost of repairing the FEB Defect, or replacing the vehicle, to Plaintiffs and the other Class members. These costs are significant, and no reasonable consumer expects to incur such costs.

8.     Defendants and their network of authorized dealers possess exclusive and superior knowledge and information regarding the FEB Defect. Despite this, Defendants have failed to notify Plaintiffs and the other Class members of the FEB Defect, who could not have reasonably discovered the defect through due diligence. Similarly, Nissan has failed to provide Plaintiffs and the other Class members with any fix or remedy for the FEB Defect, despite voluminous customer complaints.

9.     While promoting the standard, quality, and/or grade of the Class Vehicles, Nissan knowingly concealed/omitted, and actively conceals, the existence of the FEB Defect at the time of purchase or lease or otherwise to increase its profits and decrease its costs (by selling additional Class Vehicles and transferring the cost of the repair of the FEB Defect, or replacement of the vehicle, to Plaintiffs and the other Class members).

10.     Defendants knowingly omitted, concealed and suppressed material facts regarding the FEB Defect, and misrepresented the standard, quality or grade of the Class Vehicles, all at the time of purchase or lease or otherwise, which directly caused harm to Plaintiffs and the other members of the Classes. As a direct result of Defendants' wrongful conduct, Plaintiffs and the other members of the Classes have suffered damages, including, *inter alia*: (1) out-of-pocket expenses for repair of the FEB Defect; (2) costs for future repairs or replacements; (3) sale of their

vehicles at a loss; (4) diminished value of their vehicles; and/or (5) the price premium attributable to the FEB feature.

11. Plaintiffs and the other Class members therefore assert claims against Defendants for fraud, breach of express and implied warranties, violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*., violation of statutory deceptive trade practices laws of each respective state, and unjust enrichment. As alleged herein, Defendants' wrongful conduct has harmed owners and lessors of the Class Vehicles, and Plaintiffs and the other members of the Classes are entitled to damages and injunctive and declaratory relief.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question). This Court has jurisdiction over supplemental state law claims pursuant to 28 U.S.C. § 1367.

13. This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"). 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100 members of the Classes, members of the Classes (as defined below) are citizens of states different from Defendants, and greater than two-thirds of the members of the Classes reside in states other than the states in which Defendants are citizens.

14. This Court has general jurisdiction over NNA, because NNA's principal place of business is in this district. This court has specific jurisdiction over NML, because NML conducts substantial business in this District and some of the actions which gave rise to the claims took place in this state; and products, materials, or things processed, serviced, or manufactured by NML anywhere were used or consumed in this state in the ordinary course of business, commerce, trade, or use. NML is one of the largest automotive manufactures and sellers in the world. NML has, at

5

all relevant times, conducted and continues to conduct business all over the country, including Plaintiffs' states and Tennessee.

15.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and NNA is subject to personal jurisdiction in this District as a California corporation. Venue properly lies in this District pursuant to 28 U.S.C. § 1391(c)(3) with respect to NMC because, as a non-resident of the United States, NMC "may be sued in any judicial district."

<b><u>PARTIES</u></b>

**<u>Plaintiffs</u>**

    **A.  <u>California</u>**

        ***i.     Plaintiff Hoeffken***

16.     Plaintiff Angelene Hoeffken is domiciled in California and resides in Cypress, California.

17.     Plaintiff Hoeffken purchased a new 2018 Nissan Rogue from a Nissan dealership in Cerritos Nisan in Cerritos, California in June of 2018.  Plaintiff Hoeffken's Rogue is a Class Vehicle equipped with the defective FEB.

18.     Prior to purchasing her Class Vehicle, Plaintiff Hoeffken reviewed Nissan's promotional materials, such as Nissan's website and the Monroney sticker, and interacted with at least one sales representative without Nissan disclosing the FEB Defect.

19.     Through her exposure and interaction with Nissan, Plaintiff Hoeffken was aware of Nissan's uniform and pervasive marketing message of dependability and safety, which is a primary reason she purchased her Class Vehicle.  However, despite touting the safety and dependability of the Class Vehicles, at no point did Nissan disclose to her the FEB Defect.

6

20.     Plaintiff Hoeffken has experienced the FEB Defect on several occasions since she started driving her Class Vehicle.  Specifically, there have been multiple occasions where Plaintiff Hoeffken was operating her Class Vehicle under intended and foreseeable circumstances when, while driving in parking garages, the FEB light on the dashboard illuminated and the FEB system engaged with no obstacle in the vehicle's path. Plaintiff has also had the FEB Defect occur while driving on the street from unidentified triggers with no vehicle in front of her.

21.     Plaintiff Hoeffken did not receive the benefit of her bargain. She purchased a vehicle of lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The FEB Defect has significantly diminished the value of Plaintiff Hoeffken's Class Vehicle

22.     Had Nissan Disclosed the FEB Defect, Plaintiff Hoeffken would not have purchased her Class Vehicle, or certainly would have paid less to do so.

**B.  Ohio**

    *i.    Plaintiff Bereda*

23.     Plaintiff Michelle Bereda is domiciled in Ohio and resides in Franklin, Ohio.

24.     Plaintiff Bereda purchased a new 2018 Nissan Rogue from Jeff Schmitt Nissan in Beavercreek, Ohio in May of 2018. Plaintiff Bereda's Rogue is a Class Vehicle equipped with the defective FEB.

25.     Prior to purchasing her Class Vehicle, Plaintiff Bereda reviewed Nissan's promotional materials, such as the Monroney sticker, and interacted with at least one sales representative without Nissan disclosing the FEB Defect.

26.     Through her exposure and interaction with Nissan, Plaintiff Bereda was aware of Nissan's uniform and pervasive marketing message of dependability and safety, which is a

primary reason she purchased her Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles, at no point did Nissan disclose the to her the FEB Defect.

27.     Plaintiff Bereda has experienced the FEB Defect on multiple occasions since she started driving her Class Vehicle.   While operating her Class Vehicle under intended and foreseeable circumstances, her vehicle's FEB will trigger while driving downhill near her home. Further, in spring of 2021, while operating her Class Vehicle under intended and foreseeable circumstances, the FEB engaged as she was nearing a road construction plate, bringing her vehicle to a halt in the middle of a road.

28.     Plaintiff Bereda did not receive the benefit of her bargain. She purchased a vehicle of lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The FEB Defect has significantly diminished the value of Plaintiff Bereda's Class Vehicle.

29.     Had Nissan disclosed the FEB Defect, Plaintiff Bereda would not have purchased her Class Vehicle, or certainly would have paid less to do so.

**C.  North Carolina**

    ***i.     Plaintiff Neri***

30.     Plaintiff Scott Neri is domiciled in North Carolina and resides in Thomasville, North Carolina.

31.     Plaintiff Neri purchased a used 2018 Nissan Rogue from Vann York Nissan in High Point, North Carolina in July of 2020. Plaintiff Neri's Rogue is a Class Vehicle equipped with the defective FEB.

32.     Prior to purchasing his Class Vehicle, Plaintiff Neri reviewed Nissan's promotional materials, such as the Monroney sticker, and interacted with at least one sales representative without Nissan disclosing the FEB Defect.

33. Through his exposure and interaction with Nissan, Plaintiff Neri was aware of Nissan's uniform and pervasive marketing message of dependability and safety, which is a primary reason he purchased his Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles, at no point did Nissan disclose to him the FEB Defect.

34. Within months of purchase, Plaintiff Neri's Class Vehicle experienced the FEB Defect at less than 5,000 miles. While operating his vehicle under intended and foreseeable circumstances, Plaintiff Neri's Class Vehicle's FEB will apply when a car in front of him enters a turn lane. Plaintiff Neri's Class Vehicle's FEB will apply even when there is no longer a car in front of him.

35. Plaintiff Neri did not receive the benefit of his bargain. He purchased a vehicle of lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The FEB Defect has significantly diminished the value of Plaintiff Neri's Class Vehicle.

36. Had Nissan disclosed the FEB Defect, Plaintiff Neri would not have purchased his Class Vehicle, or certainly would have paid less to do so.

**Defendants**

37. Defendant Nissan North America, Inc. is a California corporation with its principal place of business in Franklin, Tennessee. NNA engages in the design, manufacturing, advertising, and marketing of Nissan automobiles, including the Class Vehicles. It markets and sells the Class Vehicles nationwide, including in Tennessee and in each state where each Plaintiff resides.

38. Defendant Nissan Motor Co. Ltd. is a Japanese corporation headquartered in Yokohama, Japan. NMC is the parent corporation of NNA and designs, manufactures, distributes, markets and sells Nissan automobiles.

39.     Upon information and belief, NMC communicates with NNA concerning virtually all aspects of the Nissan vehicles it distributes within the United States. At all relevant times, NNA acted as an authorized agent and/or alter ego of NMC while performing activities including, but not limited to, advertising, warranties, warranty repairs, dissemination of technical information, and monitoring the performance of the Class Vehicles in the United States.

40.     Upon information and belief, and at all relevant times, NMC has the contractual right to exercise, and in practice has exercised, control over NNA's work, including, but not limited to, the design of the Class Vehicles, the manner of Class vehicles' marketing, the scope of written warranties, the scope of repairs in practice to be covered under warranty, and representations made and facts withheld from consumers and the public about the Emergency Braking Defect. NMC has been directly involved in assisting, directing and controlling NNA and NNA's authorized dealers, handling of Class Member complaints regarding the Emergency Braking Defect.

41.     NMC has held NNA out as its agent for all purposes in the United States, especially as it relates to sales and marketing of Class Vehicles and for ongoing management of relationships with purchasers and lessees of Class Vehicles. It established NNA as a wholly-owned subsidiary company and allows NNA to use to the name and likeness of Nissan throughout the United States. NMC provided NNA with marketing and technical materials avoiding any distinction between NNA and NMC and instead representing NNA as nothing less than NMC's presence in the United States for purposes of selling and leasing "Nissan" branded vehicles and providing relating services.

<u>**FACTS COMMON TO ALL CAUSES OF ACTION**</u>

**A.      The FEB System Defect.**

42.      In 2017, Nissan began offering the feature known as "Forward Emergency Braking" ("FEB") as on option on the Class Vehicles. For example, FEB was available as a part of the $2,020 "SL Premium Package" option on the 2017 Nissan Rogue SL.

43.      As demonstrated below,[3] the FEB system utilizes a radar and/or camera system that measures the distance between the vehicle and its surrounding objects. If the FEB system detects a rapid decrease in distance between the vehicle and an object accompanied with no driver responsive inputs, the FEB system "provide[s] audible and visual alerts and appl[ies] braking to help you avoid or mitigate a frontal collision with a vehicle ahead."



44.      However, Nissan under designed, engineered, tested, and validated the FEB system. The FEB Defect, among other things, causes (1) the Class Vehicles to detect non-existent obstacles, triggering a braking response and causing the Class Vehicles to abruptly decelerate or stop completely, despite no need for this action., and/or (2) the FEB system to deactivate itself, thereby distracting the driver and rendering the FEB system unavailable and useless. The FEB

---

[3]      https://www.glendalenissan.com/blog/how-does-nissan-automatic-emergency-braking-work/ (last visited May 20, 2020).

Defect presents a safety hazard that distracts the Class members and renders the Class Vehicles unreasonably dangerous to consumers because it severely impacts a driver's ability to control vehicle speed as expected under normal driving conditions and maintain an appropriate speed based on traffic flow, thereby increasing the risk of a rear-end collision.

45. All Class Vehicles use the same or substantially similar FEB System.

**B. Nissan's Knowledge of the FEB Defect.**

46. Nissan knew about the problem of false activations in its FEB systems years before it put the first Class Vehicles on the market. Nissan became aware of the FEB Defect through sources not available to Plaintiffs and the other members of the Classes, including, but not limited to: pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made exclusively to Nissan's network of dealers and directly to Nissan, aggregate warranty data compiled from Nissan's network of dealers, testing conducted by Nissan in response to consumer complaints, and repair order and parts data received by Nissan from Nissan's network of dealers and suppliers, including Bosch and Continental.

47. In addition, Nissan and other members of the automotive industry knew that, as a new and not fully developed technology, automatic braking systems like FEB were prone to false activations. Nissan manufactured and sold Class Vehicles equipped with this technology anyway.

48. As further evidence of Defendants' pre-sale knowledge, the owner's manuals for earliest Class Vehicles alluded to the risk of false activations by stating "in some road or traffic conditions, the FEB system may unexpectedly apply partial braking." This warning about the FEB system was buried in small text in the middle of owner's manuals, which are several hundred pages long. Notwithstanding the FEB system being touted as a safety feature, Defendants never referenced or otherwise directed potential purchasers to this hidden disclaimer. As such, class

members would only see this disclosure, if at all, after they purchased or leased the vehicles and if they happened to fortuitously stumble upon it when reading the owner's manual. Even then, however, the disclosure is too vague, cursory, and non-specific to adequately warn anyone about the true scope and extent of the dangers of the FEB Defect.

49.     Nissan also began receiving an unusually large number of complaints about false activations almost immediately after the earliest Class Vehicles were put on the market. Nissan nonetheless continued to sell the Class Vehicles and continued to install the Continental ARS-410 radar in newer model-year Class Vehicles.

50.     Nissan had and continues to have a duty to fully disclose the true nature of the FEB Defect to Class Vehicle owners, among other reasons, because the FEB Defect poses an unreasonable safety hazard; because Nissan had and has exclusive knowledge or access to material facts about the Class Vehicles' FEB systems that were and are not known to or reasonably discoverable by Plaintiffs and the other members of the Classes; and because Nissan has actively concealed the FEB Defect from its customers at the time of purchase or repair and thereafter.

51.     Specifically, Defendants: (a) failed to disclose, at the time of purchase or repair and thereafter, any and all known material defects or material nonconformities of the Class Vehicles, including the FEB Defect; (b) failed to disclose, at the time of purchase or repair and thereafter, that the Class Vehicles and their FEB systems were not in good working order, were defective and prone to failure, and were not fit for their intended purpose; and (c) failed to disclose and/or actively concealed the fact that the Class Vehicles and their FEB systems were defective, despite the fact that Defendant learned of the FEB Defect before it placed the Class Vehicles in the stream of commerce.

52.     On June 8, 2018, Nissan released TSB NTB18-041 concerning the "Unexpected Operation of AEB, FEB OR FCW [Forward Collision Warning]" in 2018 Rogue, Rogue Hybrid, and Rogue Sport vehicles. The TSB stated that "The following system(s) operate unexpectedly or the customer reports unexpected operation: AEB (Automatic Emergency Braking); FEB (Forward Emergency Braking); FCW (Forward Collision Warning). On July 19, 2018, Nissan released an amended TSB NTB18-041a, updated to include 2017-18 Rogue, Rogue Hybrid, and Rogue Sport vehicles. Neither of these TSB's prevented false activations from occurring, and Nissan continued to receive complaints about false activations after issuing these TSBs.

53.     Since mid-2018, Nissan has issued approximately 11 different TSBs, quality actions, or other service campaigns directed at eliminating false activations in the Class Vehicles. To this day, Nissan still has not found a solution to false activations.

54.     On January 25, 2019, Nissan released NPSB18-443 AEB U – "Automatic Emergency Braking (AEB) Update Notification Letter" – related to the 2017-2018 Nissan Rogue and Rogue Sport. In this bulletin, Nissan stated "[i]n rare instances and unique roadway environments such as certain types of railroad crossings and metal overpasses, the AEB system in some vehicles may activate braking when not needed."  However, the statement that false activations only occurred in "rare instances and unique roadway environments" was false, and Nissan knew the statement was false.  Drivers were experiencing false activations in ordinary and common driving scenarios, like two lane streets, highways, and parking garages.

55.     As the Center for Auto Safety ("CAS") just explained on March 21, 2019, this "'Customer Service Initiative' intended to 'increase awareness of an available update for the Automatic Emergency Braking (AEB) system.' Presumably, this update is the repair outlined in the July 2018 TSB. … [However,] the summary portion available suggests that Nissan's

communication to Rogue owners does not acknowledge the potential safety issue involved. The language treats the problem as no more than a performance update, thus providing little incentive for consumers to avail themselves of the repair opportunity until they experience the problem."[4]

56. Federal law requires automakers like Nissan to notify (and update) the National Highway Traffic Safety Administration of potential defects. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000). Accordingly, Nissan should (and does) monitor the NHTSA database to track reports of defective FEB systems. From this source, Nissan knew that the Class Vehicles were experiencing unusually high levels of false engagements causing abrupt slow-downs or stops or deactivations.

57. As CAS explains, it "found 87 such complaints in NHTSA's VOQ data for the 2017-18 Rogue. All of these complaints indicate that the Rogue's [FEB] engaged when no obstruction was in the path of the vehicle. Many complaints indicate that braking is abrupt or forceful, endangering both the Rogue occupants as well as people in vehicles nearby, who are forced to avoid a collision with a suddenly stopped vehicle."[5]

58. Additionally, in early 2019, Nissan issued a Notice of Defect for 91,000 model year 2017 and 2018 Rogue vehicles "because their automatic emergency braking (AEB) system could unintentionally engage."[6] Despite acknowledging this dangerous defect to Transport Canada, NHTSA's Canadian counterpart, Nissan has made no such efforts to recall any of its

---

[4] The Center for Auto Safety, Petition for Defect Investigation (Mar. 21, 2019), https://www.autosafety.org/wp-content/uploads/2019/03/Center-for-Auto-Safety-Nissan-Rogue-AEB-Defect-Petition-FINAL.pdf (last visited May 7, 2020). On March 21, 2019, CAS submitted a petition to NHTSA to "initiate a Defect Investigation into false activation of the emergency braking system that is placing Rogue owners and other road users in danger." *Id.*
[5] *Id.*
[6] Nissan Canada recalls 90,000 Rogues over unintended braking, AUTOMOTIVE NEWS CANADA, April 12, 2019, available at https://canada.autonews.com/automakers/nissan-canada-recalls-90000-rogues-over-unintended-braking.

AEB-equipped vehicles in the United States, even though there are no differences between the Rogues Nissan sells to Canadian consumers and the Rogues it sells to American consumers. Instead, it continued to equip Rogue and other Nissan-brand cars with the ARS410 radar.

59.     In addition, in 2020, Nissan issued a recall for its X-Trail crossover SUV in Asia, which uses the same platform as the Nissan Rogue in the United States and Canada.  As reported by one news agency in Asia, "[a]ccording to Nissan, these vehicles are fitted with a  radar system made by Continental.  The affected radar model, ARS410 may activate especially when the X-Trail maneuvers around ….bridges, parking garages, low-hanging traffic lights, and even steep incline roads."  At that time, Nissan suggested turning off the FEB system to avoid false activations until a software update could be installed.  However, to date, Nissan still has not developed a software update that eliminates false activations.

60.     The following example complaints filed by consumers with NHTSA and posted on the Internet demonstrate that the FEB Defect is a widespread safety hazard that continues to plague the Class Vehicles.  The complaints below are examples only, and do not represent the universe of complaints that Nissan received.  The number of complaints that Nissan received was unusually high, which put Nissan on further notice of the FEB Defect.

61.     Examples of complaints about the 2017 Nissan Rogue follow:

- **Jan 10, 2018 - Mansfield, OH - Forward Collision Avoidance**

    THERE IS A SAFETY ISSUE WITH THE FRONT BRAKING SYSTEM. THERE IS EVEN A DOCUMENT SEND TO THE NISSAN DEALERSHIPS NOTIFYING THEM THAT IT IS A KNOWN ISSUE, BUT THERE IS NO FIX AS OF YET THE ENGINEERS CANNOT EVEN FIND A CAUSE FOR THE ISSUE. I ASKED FOR A COPY OF THE LETTER, BUT, OF COURSE, IT IS A "CONFIDENTIAL" DOCUMENT AND ONLY PRIVILEGED PARTIES ARE ABLE TO HAVE ACCESS TO IT. WHAT HAPPENS IS THERE WILL BE AN AUDIBLE BEEPING (TWO-THREE TIMES) AND IMMEDIATELY AFTER YOUR CAR WILL SLAM ON THE BRAKES ON IT OWN, WHICH IN

TURN KICKS ON THE ANTI-LOCK BRAKES. THERE WILL BE NOTHING ON THE SENSOR OR NOTHING IN YOUR PATH IN FRONT OF YOU. IT DOES THIS SPONTANEOUSLY. THIS WAS WHILE I WAS DRIVING!!!! THIS HAS HAPPENED TO ME 3 TIMES ALREADY. WHEN HOOKED UP TO A DIAGNOSTIC TESTER, IT THROWS A CODE THAT THERE WAS SOMETHING IN FRONT OF THE SENSOR. THE DATE MARKED ON THIS CLAIM/REPORT WAS THE LAST TIME IT HAS HAPPENED....SO FAR....

- **Dec 31, 2017 - Vacaville, CA - Forward Collision Avoidance**

  THIS VEHICLE WAS PURCHASED NEW FROM THE DEALERSHIP, NISSAN OF VACAVILLE, ON 9-16-2017. ON 10-26-2017 WHILE TRAVELING AT APPROXIMATELY 35 MPH THE VEHICLE'S FORWARD EMERGENCY BRAKING SYSTEM (FEB) SUDDENLY AND UNEXPECTEDLY ACTIVATED, BRING THE CAR TO A FULL AND COMPLETE STOP IN THE MIDDLE OF THE ROAD. THE BRAKING SYSTEM DISENGAGED WITHIN A FEW SECONDS AND I WAS ABLE TO PULL TO THE SIDE OF THE ROAD. THERE WERE NO ADVERSE CONDITIONS, OBSTRUCTIONS, OR VEHICLES WITHIN A DANGEROUS DISTANCE TO HAVE CAUSED THE ACTIVATION. THE DASHBOARD WARNING LIGHTS DISPLAYED THE ALERT MESSAGE "WARNING" "MALFUNCTION." THE VEHICLE WAS SUBSEQUENTLY TOWED TO AUTOCOM NISSAN OF CONCORD FOR SERVICE AND DIAGNOSIS. I WAS TOLD CODES U1002, C1B5D, AND C1A16-97 WERE STORED IN THE COMPUTER SYSTEM. C1A16-97 RELATES TO AN OBSTRUCTION OR BLOCKED RADAR SENSOR, BUT THAT ALL THE STORED CODES WERE IN THE PAST. C1A16-97 WAS STORED AT 1983 MILES - I EXPERIENCED NO ACTIVATION OF THE SYSTEM AT THAT TIME. ACCORDING TO THE DEALERSHIP THERE WERE NO STORED CODES RELATED TO TODAY'S INCIDENT. NISSAN TECH LINE MADE A REMOTE DIAGNOSIS AND CONCLUDED A LOOSE LICENSE PLATE FRAME LIKELY HAD CAUSED AND OBSTRUCTION, ACTIVATING THE SYSTEM. THIS IS IN CONFLICT WITH THE OWNERS MANUAL'S EXPLANATION OF FEB SHUT DOWN IN THE EVENT OF AN OBSTRUCTION. ON 12-19-2017 I RETURNED THE VEHICLE TO THE DEALERSHIP WHERE I PURCHASED THE CAR. AFTER FOUR DAYS OF DIAGNOSTIC AND ROAD TESTING I WAS TOLD THAT, ACCORDING TO NISSAN TECH LINE, SINCE THE DEALERSHIP WAS UNABLE TO DUPLICATE THE MALFUNCTION DURING THE TEST DRIVE, THEN THE CAR

IS CONSIDERED OPERATIONAL AND SAFE AND COULD BE RETURNED TO THE CUSTOMER. AND ALTHOUGH FINDING MULTIPLE PAST CODES STORED ECM-UL00L, ASB-UL002, BCM UL000-00, UL000-01, CLB40-49, CLB30-49, UL000-00, ICC /ADAS-C1B53-04, CLB54-00, UL000-01 ALL INDICATION MALFUNCTION. NONE OF WHICH HAVE BEEN RESOLVED OR REPAIRED. ## VIN PASSED ## NISSAN ROUGE S FWD 2017.5 ##

- **Dec 22, 2017 - Roswell, GA - Forward Collision Avoidance**

  THE FIRST TIME THE VEHICLE MALFUNCTIONED, I WAS DRIVING IN A GROCERY STORE PARKING LOT WITH A PERSONAL FRIEND AND SUDDENLY THE CAR'S EMERGENCY BRAKE PROTECTION ACTIVATED JOLTING THE CAR TO A STOP. THE SECOND OCCURRENCE WAS IN A PARKING DECK (DIFFERENT FROM THE FIRST LOCATION) AND THE CAR AGAIN ACTIVATED THE EMERGENCY BRAKE PROTECTION SYSTEM JOLTING THE CAR TO A STOP. I THEN FELT THIS WAS A SAFETY ISSUE AND BROUGHT THIS INTO THE NISSAN DEALERSHIP. THEY CHECKED THE CAR AND CALLED REPORTING THEY COULD NOT FIND ANYTHING WRONG WITH THE CAR AND I SHOULD PICK IT UP. I PICKED THE CAR UP AND CONTINUED TO DRIVE IT UNTIL I SWITCHED CARS WITH A PERSONAL FRIEND WHO USED THE CAR TO DRIVE ONE MILE BACK TO HOME DOWN A 4 LANE ROAD. UPON COMING TO AN INTERSECTION, SHE REPORTS SHE BEGAN SLOWING DOWN AND GOT IN A TURN LANE TO MAKE A LEFT ONTO OUR NEIGHBORHOOD ROAD AND AS SHE WAS APPROACHING THE LIGHT, THE CAR ACTIVATED THE EMERGENCY BRAKING SYSTEM, AGAIN JOLTING THE CAR TO A STOP. SHE STATES DURING AND AFTER THE CAR CAME TO A COMPLETE STOP, SHE KEPT HER FOOT ON THE BREAK THE ENTIRE TIME AND WHILE DECOMPRESSING THE BRAKE, THE CAR THEN JOLTED FORWARD CRASHING INTO THE CAR IN FRONT OF HER. I HAD THE CAR TOWED IN TO THE NISSAN DEALERSHIP AND HAD CORPORATE NISSAN STEP IN TO INVESTIGATE THE CAR. 6 WEEKS LATER THEY INVESTIGATED THE CAR REPORTING THAT NO ERROR WAS FOUND WITH THE CAR AND AGAIN I SHOULD PICK MY VEHICLE UP. I REQUESTED SPECIFIC TESTS AND ASKED THE TESTING PROCESS FOR THE CAR AND WAS ADVISED BY THE INVESTIGATION DEPARTMENT THAT THEY COULD NOT DISCLOSE THAT INFORMATION AND THAT THE TESTING

AND RESULTS WERE "PROPERTY OF NISSAN" AND THAT THEY WERE NOT OFFERING ANY FURTHER ASSISTANCE.

- **Sep 30, 2018 - Carnegie, PA - Forward Collision Avoidance**

   AUTO EMERGENCY BRAKING IS ACTIVATING WHEN THERE IS NO VEHICLE OR OBSTACLE IN FRONT OF ME. IT HAPPENEND THE FIRST TIME I LEFT THE DEALER ON AN OPEN HIGHWAY. IT HAPPENED AGAIN IN A DARK PARKING GARAGE, AND AGAIN WHEN I WAS GOING LESS THAN 10 MILES AN HOUR OVER RAILROAD TRACKS. IT HAPPENED TO MY HUSBAND GOING OVER A BRIDGE WITH METAL EXPANSION JOINTS. GOOD THING NO ONE WAS BEHIND US WHEN IT HAPPENED. I WILL BE CALLING THE DEALER IN THE MORNING. MY ROGUE HAS AROUND 3,000 MILES ON IT.

62. Complaints concerning the 2018 Nissan Rogue are similar:

- **Sep 24, 2018 - Medford, NY - Dynamic Brake Support/Brake Assist**

   TL* THE CONTACT OWNS A 2018 NISSAN ROGUE. THE CONTACT STATED THAT THE VEHICLE'S AUTOMATIC BRAKING FEATURE INDEPENDENTLY ACTIVATED WHILE THE VEHICLE WAS BEING DRIVEN AT VARIOUS SPEEDS. THERE WERE NO OBSTACLES IN THE VEHICLE'S PATH. THE FAILURE OCCURRED WITHOUT WARNING ON APPROXIMATELY SIX OCCASIONS. THE DEALER AND MANUFACTURER WERE NOT NOTIFIED OF THE FAILURE. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE FAILURE MILEAGE WAS APPROXIMATELY 1,600.

- **Sep 17, 2018 - Lubbock, TX - Forward Collision Avoidance**

   MY 2018 NISSAN ROGUE BRAKED SUDDENLY, FOR NO REASON. TRAVELING 30 MPH ON A QUIET NEIGHBORHOOD STREET. THE LIGHTS ON THE DASHBOARD FLASHED BRIEFLY, THERE WAS A LOUD GRINDING NOISE, THEN SUDDEN AND COMPLETE STOP IN THE MIDDLE OF THE ROAD. NO CARS IN FRONT OR BACK OF MINE. THE ONLY THING IN THE ROAD WAS A METAL DRAIN COVER. VERY FRIGHTENING EXPERIENCE.

- **Jul 24, 2018 - The Villages, FL - Forward Collision Avoidance**

WE PURCHASED 2018 NISSAN ROGUE IN JUNE. TODAY WE DROVE 75 MILES AND THE EMERGENCY BRAKING ACTIVATED 4 TIMES FOR NO REASON. ONCE ON THE INTERSTATE, ONCE ON THE OFF RAMP, AND TWICE ON THE HIGHWAY. THERE WERE NO RR TRACKS OR OTHER OBSTACLES. THIS HAS HAPPEN TO ME ON TWO OTHER OCCASIONS. THE VEHICLE HAS ALMOST 1000 MILES ON IT. I+M AFRAID SOMEONE WILL THINK I+M BRAKE CHECKING THEM! ILL BE SPEAKING TO THE DEALER, BUT I SAW OTHER COMPLAINTS HERE AND DECIDED TO REGISTER MINE ALSO. WHEN THIS HAPPENS IT SOUNDS AS IF YOU+RE DRIVING OVER +RUMBLE STRIPS+.

- **Jul 12, 2018 - Pittsburgh, PA - Forward Collision Avoidance**

    TWO WEEK OLD NISSAN ROGUE. THE EMERGENCY BRAKING SYSTEM ACTIVATES IN THE PARKING GARAGE WHERE I WORK. IT SEEMS TO HAPPEN ANYWHERE IN THE GARAGE (ANY FLOOR) AND WHEN I SURPASS ~15MPH. SPOKE WITH THE DEALER AND THEY ARE GOING TO TAKE A LOOK AT IT, BUT GOING BY THE NUMBER OF SIMILAR COMPLAINTS ON THIS SITE I'M BEGINNING TO THINK NISSAN NEEDS TO ISSUE A FIX AND RECALL.

63.    Consumers have logged similar complaints regarding the Nissan Leaf:

- **Jun 25, 2018 - Phoenix, AZ - Forward Collision Avoidance**

    WHILE DRIVING FORWARD, THE VEHICLE SUDDENLY, UNEXPECTEDLY AND VIOLENTLY APPLIES THE BRAKES WITHOUT ANY DRIVER INPUT WHATSOEVER! THERE ARE NO OTHER VEHICLES OR PEDESTRIANS IN THE VICINITY AT THE TIME. THIS SUDDEN BRAKING PROBLEM BEGAN ON OR ABOUT 5/15/18 AND HAPPENED ON SEVERAL OCCASIONS AFTER THAT. TWICE WHILE ENTERING THE UNDERGROUND PARKING GARAGE AT AN OFFICE BUILDING AND TWICE WHILE DRIVING ON A CITY STREET. VEHICLE HAS BEEN AT THE LOCAL NISSAN DEALER FOR OVER A WEEK BUT NEITHER THE DEALERSHIP NOR THE MANUFACTURER APPARENTLY HAS ANY IDEA HOW TO FIX THE PROBLEM. THEY THINK THAT THERE IS A FAULT IN THE AUTOMATIC EMERGENCY BRAKING SYSTEM. THE SERVICE MANAGER TOLD ME THAT OTHER INSTANCES OF THE SAME ISSUE HAVE BEEN REPORTED TO NISSAN. THE SALESPERSON INDICATED THAT THERE WERE 4 OTHER SIMILAR CASES AT THEIR DEALERSHIP ALONE.THEY

ALSO WILL NOT LET US TAKE THE VEHICLE HOME
WITHOUT SIGNING A RELEASE OF LIABILITY
DOCUMENT. THE OBVIOUS CONCERN IS THAT THE
EMERGENCY BRAKING SYSTEM WILL AGAIN
RANDOMLY ACTIVATE WHILE TRAVELING AT A HIGHER
SPEED AND CAUSE AN ACCIDENT RESULTING IN
SERIOUS PROPERTY DAMAGE AND INJURIES!

64.     The above complaints represent only a sampling of otherwise voluminous

complaints regarding the FEB Defect that members of the Classes have reported to Nissan directly

and through its dealers.

65.     Nissan knew the FEB Defect was present in all Class Vehicles equipped with the

FEB system, as demonstrated above, but it failed remedy the defect. Nissan's halfhearted and

unconscionable acts deprived and continue to deprive Plaintiffs and Class members of the benefit

of their bargain. Had Plaintiffs and Class members known about the FEB Defect, they would not

have purchased their Class Vehicles, or certainly would have paid less to do so.

**C.      Nissan Touted the Safety of the Class Vehicles and the Capabilities of the FEB
        System, Concealing the FEB Defect.**

66.     Nissan's overarching marketing message for the Class Vehicles, and specifically

the FEB System, was and is that the FEB System creates a safe and reliable vehicle. This

marketing message is false and misleading given the FEB Defect, which distracts Class Members

and can cause the Class Vehicles to suddenly and unexpectedly come to a stop in the middle of

the road.

67.     For example, Nissan dedicates a page on its website for the Nissan Safety Shield

360, touting "[a]ll-around protection" and, specifically, the FEB System:[7]

---

[7] https://www.nissanusa.com/safety-shield.html (last visited May 20, 2020).





68.    Nissan made similar representations throughout the class period:[8]

---

[8] **2017:**      http://web.archive.org/web/20170603034454/https://www.nissanusa.com/intelligent-mobility; and
 **2019:**      http://web.archive.org/web/20191109081152/https://www.nissanusa.com/experience-nissan/intelligent-mobility.html

22

# NISSAN SAFETY SHIELD CONCEPT



## 1. Monitor

Nissan is committed to its position as a leader in the world of automotive safety. This dedication to comprehensive safety goes into the engineering and design of every vehicle we make, and it drives the development of the Nissan Safety Shield technologies.

The Safety Shield Technologies Operate During Three Basic Phases:

These technologies monitor vehicle systems and the outside driving environment.

**Vehicle Dynamic Control [*]**
If VDC detects sudden over or under steer, it reduces engine power and/or applies brake pressure to individual wheels to help keep you on your steered path.

**Traction Control System**
TCS can sense drive-wheel spin and respond by reducing throttle or applying brake pressure to help maintain traction.

**Anti-lock Braking System**
In panic-braking situations the ABS rapidly pumps the brakes, helping prevent wheel lockup and helping you maintain steering control.

**Electronic Brake Force Distribution**
The EBD system sends extra force to the rear brakes when it senses additional weight in the back.



## 2. Respond

These technologies help you respond to potentially harmful situation.

**Around View® Monitor [*]**
This feature creates a bird's-eye view of your Nissan and displays it on the LCD monitor, so parking and backing-up are both safer and easier.

**Tire Pressure Monitoring System [*]**
Using an icon on your Nissan's dash, TPMS warns you when tires aren't properly inflated.

**Lane Departure Warning [*]**
If you unintentionally stray from your lane, this system lets you know with audio and visual alerts.

**Blind Spot Warning [*]**
Indicators illuminate when the system detects a vehicle in your blind spot, and the system chimes a warning if the turn signal is activated.

**RearView Monitor [*]**
When backing-up, the RearView Monitor helps you see what's directly behind you.

**Moving Object Detection [*]**
Indicators illuminate when the system detects a vehicle in your blind spot, and the system chimes a warning if the turn signal is activated.

# INTELLIGENT INNOVATION THAT'S ON YOUR SIDE

Today's Nissan vehicles offer available technologies that help look out for you, and some of them CAN even take action and help you avoid trouble. The available Blind Spot Warning with available Blind Spot Intervention is just one feature in a comprehensive suite of Intelligent Safety Shield Technologies.[*]



**INTELLIGENT FORWARD EMERGENCY BREAKING WITH PEDESTRIAN DETECTION**

Intelligent FEB with pedestrian detection can provide an audible and visual warning, even fully applying the brakes if necessary, when a pedestrian is detected.[*]

‹ ○●●●●●● ›

---



## EXPERIENCE NISSAN

VEHICLES ⌄   SHOPPING TOOLS ⌄   EXPERIENCE NISSAN ⌄   COMMERCIAL VEHICLES ⌄          SEARCH 🔍

NISSAN BLOG        NISSAN INTELLIGENT MOBILITY        NISMO® PERFORMANCE        PARTNERSHIPS        SOCIAL MEDIA

## WHAT IS NISSAN INTELLIGENT MOBILITY?

Cars that can think, communicate, learn, predict, recharge, and do it all as your partner. Nissan Intelligent Mobility is a suite of integrated technology that is designed to increase safety, comfort, and control while driving, connecting you with your vehicle and the world around you. The future of driving has arrived.



NISSAN **I**NTELLIGENT **M**OBILITY

| INTELLIGENT DRIVING | INTELLIGENT POWER | INTELLIGENT INTEGRATION |
|---|---|---|
| Feel More Confident | Feel More Excited | Feel More Connected |

69.     Nissan touting the safety and reliability of the Class Vehicles and the FEB system while knowing of the FEB Defect and its gross underperformance is unfair and unconscionable.

70.     Although Nissan was aware of the widespread nature of the FEB Defect in the Class Vehicles, and that it posed grave safety risks, Nissan has failed to take adequate steps to notify all Class Vehicle owners of the FEB Defect and provide relief.

71.     Defendants have not recalled the Class Vehicles to repair the FEB Defect and have downplayed the severity of the FEB Defect in service campaigns.  They have not offered Plaintiffs and the other Class members a suitable repair or replacement of parts related to the FEB Defect free of charge and have not reimbursed Plaintiffs and all other Class members who incurred costs for repairs related to the FEB Defect.

72.     Plaintiffs and the other Class members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

73.     Defendants have deprived Plaintiffs and the other Class members of the benefit of their bargain, exposed them all to a dangerous safety defect without any notice, and failed to repair or otherwise remedy the FEB Defect contained in the Class Vehicles. As a result of the FEB Defect, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles. Reasonable consumers, like Plaintiffs, expect and assume that a vehicle's FEB system and the related components are not defective and will not malfunction while operating the vehicle as it is intended to be operated and thus did not receive the benefit of their bargain, i.e., the price premium they paid attributable to the FEB system.

74.     Plaintiffs and the other Class members further expect and assume that Nissan will not sell or lease vehicles with known safety defects, such as the FEB Defect, and will fully disclose any such defect to consumers prior to purchase, or offer a suitable, non-defective, repair.

**D.**     **Nissan Received Pre-Suit Notice Multiple Times and in Multiple Ways.**

75.     Nissan had extensive and exclusive notice of the FEB Defect, as detailed above. Additionally, given Nissan's extensive and exclusive knowledge of the FEB Defect, its latency, and Nissan's inability to repair it, any notice requirement would be futile.

76.     Nissan further had notice of the FEB Defect because it is currently subject to litigation regarding the FEB Defect in the action *In re: Nissan North America, Inc. Litigation*, No. 3:19-cv-00843 (M.D. Tenn.).  The named plaintiffs in that action each sent Nissan pre-suit notice letters.

77.     Nissan also had notice of each individual Plaintiffs' claims because Plaintiffs Hoeffken, Neri, and Bereda sent Defendants a letter providing pre-suit notice and demand for corrective action concerning the defect at issue in this complaint. The notice specifically described the defect at issue, stated the notice was being sent pursuant to California Civil Code § 1782, U.C.C. § 2 314, Ohio Rev. Code Ann. § 1345.01 *et seq.*; and N.C.G.S.A. § 75-1.1, and stated Defendants had breached warranties and violated California, Ohio and North Carolina consumer statutes. The notice letter further stated that it was being sent on behalf of Angeline Hoeffken, Scott Neri, and Michelle Bereda, and a putative nationwide class and California subclass, Ohio subclass, and North Carolina subclass.

## CLASS ALLEGATIONS

78.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Classes:

> All persons or entities in California that purchased, lease, leased, own or owned a Class Vehicle (the "California Class");

> All persons or entities in North Carolina that purchased, lease, leased, own or owned a Class Vehicle (the "North Carolina Class");

All persons or entities in Ohio that purchased, lease, leased, own
or owned a Class Vehicle (the "Ohio Class");

79.     Subject to additional information obtained through further investigation and
discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment
or amended complaint, or narrowed at class certification.

80.     Specifically excluded from the Classes are Defendants, Defendants' officers,
directors, agents, trustees, parents, children, corporations, trusts, representatives, employees,
principals, servants, partners, joint ventures, or entities controlled by Defendants, and their heirs,
successors, assigns, or other persons or entities related to or affiliated with Defendants and/or
Defendants' officers and/or directors, the judge assigned to this action, and any member of the
judge's immediate family.

81.     **Numerosity.** The members of the proposed Classes are geographically dispersed
throughout the United States and are so numerous that individual joinder is impracticable. Upon
information and belief, Plaintiffs reasonably estimate that there are hundreds of thousands of
individuals that are members of the proposed Classes. Although the precise number of proposed
members are unknown to Plaintiffs, the true number of members of each of the Classes is known
by Defendants. More specifically, Nissan and its network of authorized dealers maintains
databases that contain the following information: (i) the name of each Class member that leased
or purchased a vehicle; and (ii) the address of each Class member. Thus, members of the proposed
Classes may be identified and notified of the pendency of this action by first class mail, electronic
mail, and/or published notice, as is customarily done in consumer class actions.

82.     **Typicality.** The claims of the representative Plaintiffs are typical of the claims of
the Class in that the representative Plaintiffs, like all other members of the Classes, paid for Class
Vehicles designed, manufactured, and distributed by Defendants which are afflicted by the FEB

Defect. The representative Plaintiffs, like all other members of the Classes, have been damaged by Defendants' misconduct in that they have incurred or will incur the cost of repairing or replacing this malfunctioning FEB system and related parts as a result of the FEB Defect. Further, the factual bases of Defendants' misconduct are common to all members of the Classes and represent a common thread of fraudulent, deliberate, and/or grossly negligent misconduct resulting in injury to all members of the Classes.

83. **Existence and predominance of common questions of law and fact.** Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes. These common legal and factual questions include, but are not limited to, the following:

(a) Whether the Class Vehicles suffer from the FEB Defect;

(b) Whether the Class Vehicles contain a design defect and/or a defect in material, manufacturing and/or workmanship;

(c) Whether the FEB Defect constitutes an unreasonable safety hazard;

(d) Whether Defendants knew or should have known about the FEB Defect and, if so, how long Defendants have known of the FEB Defect;

(e) Whether Defendants had a duty to disclose that the Class Vehicles suffer from the FEB Defect;

(f) Whether Defendants breached their duty to disclose that the Class Vehicles suffer from the FEB Defect;

(g) Whether Defendants intentionally and knowingly falsely misrepresented, concealed, suppressed and/or omitted material facts including the fact that the Class Vehicles suffered from the FEB Defect;

(h) Whether Defendants negligently and falsely misrepresented or omitted material facts including the fact that the Class Vehicles suffered from the FEB Defect;

(i) Whether Defendants made material misrepresentations and/or omissions concerning the standard, quality or grade of the Class Vehicles and the FEB Defect;

(j)    Whether members of the Classes would have paid less for the Class Vehicles if Defendants, at the time of purchase or lease, disclosed that the vehicles suffered from the FEB Defect;

(k)    Whether Defendants are liable to Plaintiffs and the Classes for breaching their express and/or implied warranties;

(l)    Whether Defendants are liable to Plaintiffs and the Classes for violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.* and/or any other statutory duties under state laws;

(m)    Whether Defendants violated applicable state consumer protection statutes;

(n)    Whether Defendants have been unjustly enriched; and

(o)    Whether Plaintiffs and the Classes are entitled to damages, restitution, equitable, injunctive, compulsory, or other relief.

84.    **Adequacy of Representation.** Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Classes. Furthermore, Plaintiffs have no interests that are antagonistic to those of the Classes.

85.    **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by members of the Classes is relatively small compared to the burden and expense of individual litigation of their claims against Defendants. It would, thus, be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in

a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

86.     In the alternative, the Classes may also be certified because:

(a)     the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendants;

(b)     the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)     Defendants have acted or refused to act on grounds generally applicable to the Classes as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Classes as a whole.

## CLAIMS FOR RELIEF

### COUNT 1
### Fraudulent Omission
(On behalf of Plaintiffs and the proposed Classes)

87.     Plaintiffs incorporate and reallege each of the preceding paragraphs as though fully set forth herein.

88.     Plaintiffs bring this count on behalf of themselves and the other Class members.

89.     Defendants intentionally and knowingly falsely concealed, suppressed, and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the FEB system in the Class Vehicles is defective, exposing drivers, occupants, and members of the public to safety risks with the intent that Plaintiffs and the other members of the Classes rely on Defendants' omissions. As a direct result of Defendants' fraudulent conduct, Plaintiffs and the other members of the Classes have suffered actual damages.

90. As a result of Defendants' failure to disclose to Plaintiffs and the other members of the Classes the material fact that the FEB system in the Class Vehicles is defective, owners and lessors of the Class Vehicles are required to spend thousands of dollars to repair or replace the FEB Defect or sell their vehicles at a substantial loss. The fact that the FEB system in the Class Vehicles is defective is material because no reasonable consumer expects that he or she will have to spend thousands of dollars for diagnosis, repair, or replacement of the FEB Defect, and because Plaintiffs and the other members of the Classes had a reasonable expectation that the vehicles would not suffer from the FEB Defect.

91. The fact that the FEB system installed in the Class Vehicles is defective is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. Because of the FEB Defect, the Class Vehicles may suddenly brake automatically while driving in traffic. Drivers and occupants of the Class Vehicles are at risk for rear-end collisions and other accidents caused by the FEB Defect, and the general public is also at risk for being involved in an accident with a Class Vehicle. Plaintiffs and the other members of the Classes would not have purchased the Class Vehicles but for Defendants' omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the FEB Defect, or would have paid less for the Class Vehicles.

92. Defendants knew their concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts. Defendants knew their concealment and suppression of the FEB Defect would sell more Class Vehicles.

93. Despite notice of the FEB Defect from, among other things, pre-production testing, numerous consumer complaints, warranty data, and dealership repair orders, Defendants have not recalled the Class Vehicles to repair the Defect, have not offered their customers a suitable repair

or replacement free of charge, and have not offered to reimburse all Class members the costs they incurred relating to diagnosing and repairing the FEB Defect or for the premium price that they paid for the FEB feature.

94.     At minimum, Defendants knew about the FEB Defect by way of customer complaints filed with affiliated dealerships and through the NHTSA, as extensively documented above. As such, Defendants acted with malice, oppression, and fraud. Plaintiffs and the other members of the Classes reasonably relied upon Defendants' knowing, affirmative and active false representations, concealment, and omissions. As a direct and proximate result of Defendants' false representations, omissions, and active concealment of material facts regarding the FEB Defect, Plaintiffs and the other members of the Classes have suffered actual damages in an amount to be determined at trial.

**COUNT 2**
**Breach of Express Warranty**
(On behalf of Plaintiffs and the proposed Classes)

95.     Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

96.     Plaintiffs bring this count on behalf of themselves and the other Class members.

97.     Defendants marketed the Class Vehicles as safe, built to last, and reliable vehicles. Such representations formed the basis of the bargain in Plaintiffs' and the other Class members' decisions to purchase or lease the Class Vehicles.

98.     Defendants are and were at all relevant times merchants and sellers of motor vehicles as defined under the Uniform Commercial Code.

99.     With respect to leases, Defendants are and were at all relevant times lessors of motor vehicles as defined under the Uniform Commercial Code.

100.     The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code.

101.     In connection with the purchase or lease of each of the Class Vehicles, Defendants provide warranty coverage for the Class Vehicles under one or more manufacturer's warranties. For illustrative purposes, NNA offers a 36-month or 36,000-mile Basic Warranty that "covers any repairs needed to correct defects in materials or workmanship of all parts and components of each new Nissan vehicle supplied by Nissan." Under warranties provided to Plaintiffs and the other members of the Classes, Defendants promised to repair or replace defective FEB components arising out of defects in materials and/or workmanship, such as the FEB Defect, at no cost to owners or lessors of the Class Vehicles.

102.     Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and the other members of the Classes purchased or leased their Class Vehicles.

103.     Despite the existence of the warranties, Defendants failed to inform Plaintiffs and the other members of the Classes that the Class Vehicles contained the FEB Defect, and, thus, wrongfully transferred the costs of repair or replacement of the FEB Defect to Plaintiffs and the other members of the Classes.

104.     Defendants have failed to provide Plaintiffs or the other members of the Classes with a meaningful remedy for the FEB Defect, in clear breach of the express warranty described above, promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts they supplied.

105.     Defendants were provided extensive pre-suit notice of the FEB Defect, and as such have been afforded a reasonable opportunity to cure their breach of written warranties. Any additional time to do so would be unnecessary and futile because Defendants have known of and

concealed the FEB Defect and, on information and belief, have refused to repair or replace the FEB Defect free of charge despite the FEB Defect's existence at the time of sale or lease of the Class Vehicles.

106.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs and the other members of the Classes have been damaged in an amount to be determined at trial.

107.    Finally, because of Defendants' breach of express warranty as set forth herein, Plaintiffs and the other members of the Classes assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other members of the Classes of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

108.    On approximately December 17, 2021, Plaintiffs sent Nissan a demand letter via Certified Mail, Return Receipt Requested, that complied in all respects with UCC § 2-607(a).  The letter informed Nissan of the breaches of warranty described herein, and requested that Nissan take corrective action.  Nissan has refused to comply with any aspect of the letter.

## COUNT 3
## Breach of Implied Warranty
(On behalf of Plaintiffs and the proposed Classes)

109.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

110.    Plaintiffs bring this count on behalf of themselves and the other members of the Classes.

111.    Plaintiffs and the other members of the Classes purchased or leased the Class Vehicles from Defendants by and through their authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third

party. At all relevant times, Defendants were the manufacturers, distributors, warrantors, and/or sellers of Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

112.    Defendants are and were at all relevant times merchants and sellers of motor vehicles as defined under the Uniform Commercial Code.

113.    With respect to leases, Defendants are and were at all relevant times lessors of motor vehicles as defined under the Uniform Commercial Code.

114.    The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code.

115.    Defendants impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

116.    The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain the FEB Defect and present an undisclosed safety risk to drivers and occupants. Thus, Defendants breached their implied warranty of merchantability.

117.    Plaintiff Bareda's claim under Ohio law is alleged as a breach of implied warranty in tort.  As alleged more fully above, the FEB Defect rendered his car unfit for its ordinary, intended use; the FEB Defect existed when the product left Defendants' possession; and the FEB Defect was the proximate cause of plaintiff's financial injuries.

118.    Defendants were provided extensive pre-suit notice of the FEB Defect, and as such have been afforded a reasonable opportunity to cure their breach of written warranties. Any additional time to do so would be unnecessary and futile because Defendants have known of and

concealed the FEB Defect and, on information and belief, have refused to repair or replace the FEB Defect free of charge despite the FEB Defect's existence at the time of sale or lease of the Class Vehicles.

119.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other members of the Classes have been damaged in an amount to be proven at trial.

**COUNT 4**
**Violation of the Magnuson-Moss Warranty Act**
(On behalf of Plaintiffs and the proposed Classes)

120.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

121.    Plaintiffs bring this count on behalf of themselves and the other members of the Classes.

122.    Plaintiffs satisfy the MMWA jurisdictional requirement because they allege diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

123.    Plaintiffs and the other members of the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

124.    Defendants are "supplier[s]" and "warrantor[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4)-(5).

125.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

126.    The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

127.    Defendants provided Plaintiffs and the other members of the Class with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). For illustrative purposes,

NNA offers a 36-month or 36,000-mile Basic Warranty that "covers any repairs needed to correct defects in materials or workmanship of all parts and components of each new Nissan vehicle supplied by Nissan."

128. Under warranties provided to Plaintiffs and the other members of the Class, Defendants promised to repair or replace defective FEB components arising out of defects in materials and/or workmanship, such as the FEB Defect, at no cost to owners or lessors of the Class Vehicles. However, Defendants have failed to provide owners with a remedy to the FEB Defect.

129. The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

130. Defendants breached these warranties by misrepresenting the standard, quality or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the FEB Defect. Without limitation, the Class Vehicles share a common defect in design, material, manufacturing and/or workmanship. Through their issuance of TSBs to their authorized dealers, Defendants have acknowledged that the Class Vehicles are not of the standard, quality or grade that Defendants represented at the time of purchase or lease and contain the FEB Defect.

131. Plaintiffs and the other members of the Class have had sufficient direct dealings with Defendants or their agents (dealerships) to establish privity of contract between Defendants, on the one hand, and Plaintiffs and the other members of the Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each other member of the Class are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessors of the Class Vehicles only.

132.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, Defendants knew of the material misrepresentations and omissions concerning the standard, quality or grade of the Class Vehicles and the existence of the FEB Defect, but failed to remediate the same. Likewise, Defendants failed to disclose the FEB Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

133.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

134.    Plaintiffs, individually and on behalf of the other members of the Classes, seek all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT 5
### Unjust Enrichment
(On behalf of Plaintiffs and the proposed Classes)

135.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

136.    Plaintiffs bring this count on behalf of themselves and the other members of the Classes.  To the extent required by law, Plaintiffs allege this cause of action in the alternative, as permitted by Fed. R. Civ. P. 8.

137.    Plaintiffs and the other members of the Classes conferred a benefit on Defendants by leasing or purchasing the Class Vehicles. Defendants were and should have been reasonably expected to provide Class Vehicles free from the FEB Defect.

138.    Defendants unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of their false representations, omissions, and concealment of the FEB Defect in the Class Vehicles.

139.    As a proximate result of Defendants' false representations, omissions, and concealment of the FEB Defect in the Class Vehicles, and as a result of Defendants' ill-gotten gains, benefits and profits, Defendants have been unjustly enriched at the expense of Plaintiffs and the other members of the Classes. It would be inequitable for Defendants to retain their ill-gotten profits without paying the value thereof to Plaintiffs and the other members of the Classes.

140.    There is a direct relationship between Defendants on the one hand, and Plaintiffs and the other class members on the other, sufficient to support a claim for unjust enrichment. Defendants, acting in concert, failed to disclose the FEB Defect to improve retail sales, which in turn improved wholesale sales.  Conversely, Defendants knew that disclosure of the FEB Defect would suppress retail and wholesale sales of the Class Vehicles, suppress leasing of the Class Vehicles, and would negatively impact the reputation of Defendants' brand among Plaintiffs and the other Class members. Defendants also knew their concealment and suppression of the FEB Defect would discourage Plaintiffs and the other Class members from seeking replacement or repair concerning the FEB Defect, thereby increasing profits and/or avoiding the cost of such replacement or repairs.

141.    Plaintiffs and the other members of the Classes are entitled to restitution of the amount of Defendants' ill-gotten gains, benefits and profits, including interest, resulting from their unlawful, unjust and inequitable conduct.

142.    Plaintiffs and the other members of the Classes seek an order requiring Defendants to disgorge their gains and profits to Plaintiffs and the other members of the Classes, together with interest, in a manner to be determined by the Court.

**COUNT 6**
**Violation of California's Consumer Legal Remedies Act,**
**(Cal. Civil Code § 1750 *et seq.*)**
(On behalf of the California Plaintiff and proposed Class)

143.    Plaintiff Hoeffken ("Plaintiff" for the purpose of this Count) incorporates by reference each preceding paragraph as though fully set forth herein.

144.    Plaintif brings this claim on behalf of herself and the other members of the California Class ("Class" for purposes of this Count).

145.    NNA is a "person" as defined by California Civil Code § 1761(c). NMC is a "person" as defined by California Civil Code § 1761(c).

146.    Plaintiff and the other California Class Members are "consumers" within the meaning of California Civil Code § 1761(d).

147.    By failing to disclose and concealing the defective nature of the Class Vehicles' FEBs from Plaintiff and the other members of the Class, Defendants violated California Civil Code § 1770(a), as they represented that the Class Vehicles had characteristics and benefits that they do not have, represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another, and advertised the Class Vehicles with the intent not to sell them as advertised. *See* Cal. Civ. Code §§ 1770(a)(5), (7) & (9).

148.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

149.    Defendants knew that the Class Vehicles' FEB systems suffered from an inherent defect, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

150.    Defendants were under a duty to Plaintiff and the other members of the Class to disclose the defective nature of the Class Vehicles' FEB systems and/or the associated repair costs because: a) Defendants were in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles' FEBs; b) Plaintiff and the other members of the California Class could not reasonably have been expected to learn or discover that their FEBs have a dangerous safety defect until after they purchased the Class Vehicles; and c) Defendants knew that Plaintiff and the other members of the California Class could not reasonably have been expected to learn about or discover the FEB Defect.

151.    By failing to disclose the FEB Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

152.    The facts concealed or not disclosed by Defendants to Plaintiff and the other members of the Class are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them. Had Plaintiffs and the other members of the California Class known that the Class Vehicles' FEBs were defective, they would not have purchased the Class Vehicles or would have paid less for them.

153.    Plaintiff and the other members of the California Class are reasonable consumers who do not expect that their vehicles will suffer from a FEB Defect. That is the reasonable and objective consumer expectation for vehicles and their FEB systems.

154.    As a result of Defendants' misconduct, Plaintiff and the other members of the California Class have been harmed and have suffered actual damages in that the Class Vehicles and their FEB systems are defective and require repairs or replacement.

155.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff and the other members of the California Class have suffered and will continue to suffer actual damages.

156.    Defendants were provided extensive pre-suit notice of the FEB Defect, and as such have been afforded a reasonable opportunity to cure their breach of written warranties. Any additional time to do so would be unnecessary and futile because Defendants have known of and concealed the FEB Defect and, on information and belief, have refused to repair or replace the FEB Defect free of charge despite the FEB Defect's existence at the time of sale or lease of the Class Vehicles.

157.    Plaintiff seeks all available relief under the CLRA for all violations complained of herein, including, but not limited to, damages, punitive damages, attorneys' fees and cost and any other relief that the Court deems proper.

158.    Accordingly, Plaintiff and the other members of the Class seek an order enjoining the acts and practices described above.

## COUNT 7
### Violation of California's Unfair Competition Law ("UCL")
### (Cal. Bus. & Prof. Code § 17200)
(On behalf of the California Plaintiff and proposed Classes)

159.    Plaintiff Hoeffken ("Plaintiff" for the purpose of this Count) incorporates by reference each preceding paragraph as though fully set forth herein.

160.    Plaintiff brings this claim on behalf of herself and the other members of the California Class ("Class" for purposes of this Count).

161.    California Business & Professions Code Section 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

162.    Defendants knew that the Class Vehicles' FEB systems suffered from an inherent defect, were defectively designed and/or manufactured, would fail prematurely, and were not suitable for their intended use.

163.    In failing to disclose the FEB Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so, thereby engaging in a fraudulent business act or practice within the meaning of the UCL.

164.    Defendants were under a duty to Plaintiff and the other members of the Class to disclose the defective nature of the Class Vehicles' FEB systems because: a) Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles' FEB systems; b) Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles' FEB systems; and c) Defendants actively concealed the defective nature of the Class Vehicles' FEB systems from Plaintiff and the other Class Members at the time of sale and thereafter.

165.    The facts concealed or not disclosed by Defendants to Plaintiff and the other members of the Class are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Had Plaintiff and the other members of the Class known that the Class Vehicles suffered from the FEB Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

166.    Defendants continued to conceal the defective nature of the Class Vehicles and their FEB systems even after Plaintiff and the other members of the Class began to report problems. Indeed, Defendants continue to cover up and conceal the true nature of this systematic problem today.

167.    Defendants' omissions of material facts, as set forth herein, also constitute "unfair" business acts and practices within the meaning of the UCL, in that Defendants' conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous. Plaintiff also asserts a violation of public policy arising from Defendants' withholding of material safety facts from consumers. Defendants' violation of consumer protection and unfair competition laws resulted in harm to consumers.

168.    Defendants' omissions of material facts, as set forth herein, also constitute unlawful business acts or practices because they violate consumer protection laws, warranty laws and the common law as set forth herein.

169.    Thus, by their conduct, Defendants have engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

170. Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business, and were capable of deceiving a substantial portion of the purchasing public.

171. Defendants were provided extensive pre-suit notice of the FEB Defect, and as such have been afforded a reasonable opportunity to cure their breach of written warranties. Any additional time to do so would be unnecessary and futile because Defendants have known of and concealed the FEB Defect and, on information and belief, have refused to repair or replace the FEB Defect free of charge despite the FEB Defect's existence at the time of sale or lease of the Class Vehicles.

172. As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiff and the other members of the Class have suffered and will continue to suffer actual damages.

173. Defendants have been unjustly enriched and should be required to make restitution to Plaintiff and the other members of the Class pursuant to sections 17203 and 17204 of the Business & Professions Code.

## COUNT 8
### Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code § 1790 *et seq.*
(On behalf of the California Plaintiff and proposed Classes)

174. Plaintiff Hoeffken ("Plaintiff" for the purpose of this Count) incorporates by reference each preceding paragraph as though fully set forth herein.

175. Plaintiff brings this claim on behalf of herself and the other members of the California Class ("Class" for purposes of this Count).

176.     Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, et seq., every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty that the goods are merchantable, as defined in that Act.

177.     The Class Vehicles at issue here are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

178.     Plaintiff and the California Class members who purchased the Class Vehicles are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

179.     Defendants are in the business of manufacturing, assembling, producing and/or selling the Class Vehicles to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

180.     Defendants impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

181.     The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain the FEB Defect and present an undisclosed safety risk to drivers and occupants.

182.     The Class Vehicles were defective at the time of sale when they left the exclusive control of Defendants or their agents.

183.     Even if Defendants' express warranty purportedly included a disclaimer, the disclaimer was legally insufficient to bar this claim.  Under section 1792.3 of the Song-Beverly Act, implied warranties of merchantability and fitness may only be waived when the sale of consumer goods is made on an "as is" or "with all faults" basis.  The Class Vehicles were not sold on an "as is" or "with all faults" basis.

184.    As a direct and proximate cause of Defendants' violation of the Song-Beverly Act, Plaintiffs and California Class members have been injured and harmed because they would not have purchased Class Vehicles if they knew about the defect at issue here.

185.    Plaintiff Hoeffken and the California Class members seek all relief available under the Song-Beverly Act.

**COUNT 9**
**Violations of the North Carolina**
**Unfair and Deceptive Trade Practices Act**
**(N.C. Gen. Stat. §§ 75-1.1, *et seq.*)**
(On behalf of the North Carolina Plaintiff and the proposed Classes)

186.    Plaintiff Neri ("Plaintiff," for purposes of the North Carolina Class's claims) incorporates by reference each preceding paragraph as though fully set forth herein.

187.    Plaintiff brings this Count individually and on behalf of the other members of the North Carolina Class (the "Class," for purposes of this Count).

188.    Nissan engaged in unlawful, unfair, and deceptive trade practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act by advertising, selling, and warranting the defective Class Vehicles.

189.    Nissan knew that the Class Vehicles suffered from the FEB Defect that can result in sudden and unexpected braking during operation.

190.    In advertising, selling, and warranting the Class Vehicles, Nissan omitted material facts concerning the FEB Defect that can result in sudden and unexpected braking engine damage. Nissan failed to give Plaintiff and the other Class members sufficient notice or warning regarding this defect.

191.    Nissan intended that Plaintiff and the other Class members rely upon Nissan's omissions when purchasing the Class Vehicles.

192. Plaintiff and the other Class members were deceived by Nissan's concealment of the defect.

193. Nissan's conduct was in commerce and affected commerce.

194. Defendants were provided extensive pre-suit notice of the FEB Defect, and as such have been afforded a reasonable opportunity to cure their breach of written warranties. Any additional time to do so would be unnecessary and futile because Defendants have known of and concealed the FEB Defect and, on information and belief, have refused to repair or replace the FEB Defect free of charge despite the FEB Defect's existence at the time of sale or lease of the Class Vehicles.

195. As a direct and proximate result of these unfair, willful, unconscionable, and deceptive commercial practices, Plaintiff and the other Class members have been damaged and are entitled to recover actual and treble damages, as well as attorneys' fees and costs, and all other relief allowed under N.C. Gen. Stat §§ 75-16 and 75-16.1.

**COUNT 10**
**Ohio Consumer Sales Practices Act**
**(Ohio Rev. Code Ann. §§ 1345.01, *et seq.*)**
(On behalf of the Ohio Plaintiff and the proposed Classes)

196. Plaintiff Bereda ("Plaintiff," for purposes of the Ohio Class's claims) incorporates by reference each preceding paragraph as though fully set forth herein.

197. Plaintiff brings this Count individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

198. Nissan, Plaintiff, and the other Class members are "persons" within the meaning of Ohio Rev. Code Ann. § 145.01(B). Nissan is a "supplier" as defined by Ohio Rev. Code Ann. § 1345.01(c).

199.    Plaintiff and the other Class members are "consumers" as that term is defined in Ohio Rev. Code Ann. § 1345.01(D), and their purchase and lease of the Class Vehicles are "consumer transactions" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

200.    Ohio Rev. Code Ann. § 1345.02 prohibits unfair or deceptive acts or practices in connection with consumer transactions.

201.    In the course of Nissan's business, Nissan violated the Ohio Consumer Sales Practices Act ("CSPA") by selling Class Vehicles with the FEB Defect, which can cause sudden or unexpected braking, or negligently concealing or suppressing material facts concerning the FEB Defect in the Class Vehicles.

202.    Further, as a result of placing a defective product into the stream of commerce, Nissan has breached its implied warranty in tort, which is an unfair and deceptive act, as defined in Ohio Rev. Code Ann. § 1345.02(B).

203.    Nissan has committed unfair and deceptive acts in violation of the Ohio CSPA by knowingly placing into the stream of commerce the Class Vehicles with the FEB Defect.

204.    Moreover, Nissan has committed an unfair and deceptive act by knowingly concealing the FEB Defect in the Class Vehicles and failing to inform Plaintiff and the other Class members of this defect.

205.    Nissan's unfair or deceptive acts or practices were likely to, and did, in fact, deceive consumers, including Plaintiff and the other Class members, about the true reliability, dependability, efficiency, and quality of the Class Vehicles.

206.    Plaintiff and the other Class members suffered ascertainable loss and actual damages as a direct result of Nissan's concealment of and failure to disclose material information, namely, the FEB Defect. Plaintiff and the other Class members who purchased or leased the Class

Vehicles would not have done so, or would have paid significantly less, if the true nature of the Class Vehicles had been disclosed. Plaintiff and the other Class members also suffered diminished value of their vehicles.

207. As described at length above, Defendants were provided extensive pre-suit notice of the FEB Defect, and as such have been afforded a reasonable opportunity to cure their breach of written warranties. Any additional time to do so would be unnecessary and futile because Defendants have known of and concealed the FEB Defect and, on information and belief, have refused to repair or replace the FEB Defect free of charge despite the FEB Defect's existence at the time of sale or lease of the Class Vehicles.

208. The Ohio Attorney General has made available for public inspection prior state court decisions which held that the acts and omissions of Defendants as detailed in this Complaint, including, but not limited to, the failure to honor both its implied and express warranties; and the concealment and/or non-disclosure of a substantial defect, constitute deceptive sales practices in violation of the CSPA. These cases include, but are not limited to, the following:

    a.   Staten v. Eppy's Nissan/Yugo, Inc. (OPIF #10001019)

    b.   Mason v. Mercedes Benz USA, LLC (OPIF #10002382);

    c.   State ex rel. Betty D. Montgomery v. Ford Motor co. (OPIF #10002123);

    d.   State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc. (OPIF #10002025);

    e.   Borror v. MarineMax of Ohio, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

    f.   State ex rel. Jim Petro v. Craftmatic Organization, Inc. (OPIF #10002347);

    g.   Brown v. Spears (OPIF #10000403);

h.   Brinkman v. Mazda Motor of America, Inc. (OPIF #10001427);

i.   Mosley v. Performance Mitsubishi AKA Automanage (OPIF #10001326); and

j.   Walls v. Harry Williams dba Butch's Auto Sales (OPIF #10001524).

209.   Nissan is liable to Plaintiff and the other Class members for compensatory damages, injunctive/equitable relief, and attorneys' fees pursuant to Ohio Rev. Code Ann. § 1345.09.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment on behalf of themselves and the other members of the Classes as follows:

A.   For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiffs as Class representatives; and naming Plaintiffs' attorneys as Class Counsel representing the Class members;

B.   For an order finding in favor of Plaintiffs and the other Class members on all counts asserted herein;

C.   For an order awarding statutory, compensatory, treble, and punitive damages in amounts to be determined by the Court and/or jury;

D.   For injunctive relief enjoining the illegal acts detailed herein;

E.   For prejudgment interest on all amounts awarded;

F.   For an order of restitution and all other forms of equitable monetary relief; and

G.   For an order awarding Plaintiffs their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: February 14, 2022                    Respectfully submitted,

By:/s/ *Benjamin A. Gastel*
J. Gerard Stranch, IV (BPR 23045)
Benjamin A. Gastel (BPR 28699)
BRANSTETTER, STRANCH & JENNINGS, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203

Phone: 615-254-8801
Fax: 615-255-5419
Email: gerards@bsjfirm.com
        beng@bsjfirm.com

Alyson Steele Beridon
BRANSTETTER, STRANCH & JENNINGS, PLLC
425 Walnut St. STE 2315
Cincinnati, OH 45202
Phone: 513-381-2224
Fax: 615-255-5419
Email: alysonb@bsjfirm.com

*Counsel for Plaintiffs and the Proposed Class*